IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CAITLIN FRIDLEY, ) | CASE NO. 5:25-CV-01047-JRA |
| ) | |
| Plaintiff, ) | |
| ) | JUDGE JOHN R. ADAMS |
| vs. ) | UNITED STATES DISTRICT JUDGE |
| ) | |
| COMMISSIONER OF SOCIAL SECURITY ) | MAGISTRATE JUDGE |
| ADMINISTRATION, ) | JONATHAN D. GREENBERG |
| ) | |
| Defendant. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| ) | |

Plaintiff, Caitlin Fridley ("Plaintiff" or "Fridley"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Medicare coverage and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In February 2022, Fridley filed an application for Medicare and SSI, alleging a disability onset date of August 1, 2019 and claiming she was disabled due to "PTSD, anxiety, major depressive disorder, and ADHD." . (Transcript ("Tr.") 69, 80.) The applications were denied initially and upon reconsideration, and Fridley requested a hearing before an administrative law judge ("ALJ"). (Tr. 107, 111, 121, 124, 127.)

---

[1] On May 7, 2025, Frank J. Bisignano became the Commissioner of Social Security.

On February 21, 2024, an ALJ held a hearing, during which Fridley, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 38-68.)  On March 29, 2024, the ALJ issued a written decision finding Fridley was not disabled.  (*Id*. at17-37.)  The ALJ's decision became final on March 20, 2025, when the Appeals Council declined further review.  (*Id*. at 1.)

On May 21, 2025, Fridley filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos.6, 8, 9.) Fridley asserts the following assignment of error:

1. Whether the ALJ's assessment of Jennifer Skruck, MA, LPCC-S's medical opinion is supported by substantial evidence.

(Doc. No. 6 at 19.)

## II. EVIDENCE

### A.    Personal and Vocational Evidence

Fridley was born in 1987 and was 36 years-old at the time of her administrative hearing (Tr. 40, 43), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has a high school education.  (Tr. 45.)  She has past relevant work as a waitress.  (*Id*.)

### B.    Relevant Medical Evidence[2]

On January 2, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 337.) She had symptoms of depression and anxiety. (*Id*.) She reported some medications were effective at reducing symptoms in the past. (*Id*.) Mental status exam revealed moderate to severe depressed mood, hopelessness, psychomotor retardations, tense/anxious, severe disturbed sleep and poor concentration, mild suicidal thoughts and social isolation. (*Id*. at 338.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On January 9, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 335.) She reported recent self-injurious behavior after a significant period of time without engaging in such behavior. (*Id*.) She reported meeting with her primary care physician who prescribed Wellbutrin. (*Id*.)

On January 14, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 334.) She reported a "significant panic attack." (*Id*.) She discussed concern that Wellbutrin may have increased anxiety symptoms. (*Id*.) She reported difficulty sharing space with her former partner/father of her children. (*Id*.)

On January 16, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 333.) She reported taking a leave of absence from work due to her symptoms. (*Id*.) She discussed taking Wellbutrin only once per day despite being prescribed for twice per day due to a concern about medication combination. (*Id*.)

On January 23, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 332.) She reported anxiety and sadness related to residing with her ex who wants to continue their relationship. (*Id*.) She denied self-injurious behavior and acknowledged passive thoughts of death. (*Id*.)

On January 24, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 331.) Fridley reported improved mood and functioning due to setting clear boundaries with her ex. (*Id*.)

On January 30, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 330.) She reported increased sadness, recent incident of self-harm, and ambivalence about the end of her relationship. (*Id*.)

On February 4, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 329.) She reported sadness and anxiety regarding her "current situation". (*Id*.) She denied self-harm. (*Id*.)

On February 7, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 327.) She reported her primary care physician changed her medication from Wellbutrin to Effexor. (*Id*.) She reported utilizing "increased supports" which was reinforced. (*Id*.) They reviewed journaling Fridley brought to the

session, which included some traumatic childhood events, thoughts and behaviors associated with self-harm, and activities that create pleasure. (*Id.*)

On February 18, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 325.) She reported overall progress since starting counseling, including a decrease in self-harm behavior. (*Id.*) They discussed past and present family experiences and her current relationship that cause emotional distress. (*Id.*)

On February 21, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 324.) She discussed "current stressor" of living with her ex-partner and coping thoughts. (*Id.*) She reported her medication was changed to Celexa due to feeling tired on the former medication. (*Id.*)

On February 25, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 323.) She reported slight improvement in functioning and reduction in self-harm behavior. (*Id.*)

On February 27, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 322.) She reported her living situation was stressful and having poor sleep. (*Id.*) They explored thought patterns that interfere with self-compassion and alternative thinking. (*Id.*)

On March 4, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 321.) She reported difficulty living with her ex and ambivalence toward the relationship. (*Id.*) They discussed self-harm behavior connected to the circumstances and not occurring when she is not around her ex-partner. (*Id.*)

On March 6, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 320.) They discussed her ambivalence about breaking up with her significant other. (*Id.*) Firdley reported nightmares were returning. (*Id.*)

On April 15, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 366.) She reported increased anxiety and stopping Wellbutrin and starting Celexa instead. (*Id.*) They discussed her increased ambivalence about ending her relationship with her significant other. (*Id.*)

4

On May 6, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 362.) She reported her increased dose of medication appears to be reducing her panic. (*Id.*) She identified increased stressors as well as increased anxiety and sadness. (*Id.*)

On May 13, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 361.) Fridley reported increased sadness and explored triggers including guilt related to time away from her children and a write up at work for tardiness. (*Id.*) She reported a decrease in self-harm behaviors. (*Id.*)

On May 15, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 360.) She was "less tearful", and they discussed her reluctance to address her self-harm behavior because she believes it helps her cope. (*Id.*)

On May 20, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 359.) They discussed her recent write-up at work and the impact it caused on her. (*Id.*)

On June 10, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 351.) They reviewed a list of tasks she believes she needed to do before her lease expires and whether she should remain in a relationship with her children's father. (*Id.*)

On June 12, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 350.) Fridley reported "significant stressors" regarding work, her relationship with her significant other, and her relationship with her best friend, "which resulted in emotional distress and incident of self-harm." (*Id.*)

On June 17, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 349.) She reported anxiety regarding her significant other's response to her thoughts and feelings about their relationship. (*Id.*)

On June 24, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id.* at 348.) Fridley discussed work stressors, including work write-ups and corrective action plan. (*Id.*)

On July 1, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 346.) She reported self-harm after refraining from same for a period of time. (*Id*.) She explained relying on self-harm to cope with her sadness. (*Id*.)

On July 18, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 392.) She explained her depression symptoms increase when she refrains from self-harm. (*Id*.)

On July 31, 2019, Ms. Skruck informed one of Fridley's new providers that she "struggles with episodes of depression" which prompts her to engage in self-harm. (*Id*. at 386.) Ms. Skruck reported that Fridley "has had times where either she is not depressed or has more manageable symptoms" and she does not engage in self-harm. (*Id*.)

On August 2, 2019, Fridley presented for an evaluation with psychiatrist Mark Snavely, M.D. (*Id*. at 381.) She reported depression and anxiety symptoms. (*Id*.) She reported graduating from high school and completing some college, with plans to continue her degree in the fall. (*Id*. at 382.) Her co-habitation with her ex-romantic partner causes "a great degree of stress". (*Id*.) Mental status examination revealed fluent speech, depressed mood, restricted and anxious affect, circumstantial thought process, no suicidal or homicidal ideation, no psychotic symptoms, intact memory, adequate fund of knowledge, preserved attention and concentration, poor insight, and fair judgment. (*Id*.) Dr. Snavely diagnosed her with chronic depression and anxiety, historic eating disorder, psychostimulant dependence, and "probable personality disorder with cluster B traits." (*Id*.) She was prescribed a new medication to treat her depression and anxiety symptoms. (*Id*.) Dr. Snavely advised her to stop her psychostimulant medication because those medications often worsen depression and anxiety symptoms. (*Id*.) She was ambivalent regarding this consideration and expressed a need for the medication to focus at work despite no clinical history of attention difficulties. (*Id*.)

On August 8, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 377.) She presented with a broader affect. (*Id*.) She expressed reluctance to take her new medication due to concerns

of weight gain, and reluctance to wean off ADHD medication due to concern that she will be unable to focus. (*Id*.)

On August 15, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 375.) Fridley reported her last day of her job was August 14, 2019. (*Id*.) They discussed her ambivalent feelings about ending her job and problem solved steps needed to prepare for her return to college. (*Id*.)

On September 4, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 418.) She reported taking no medication for depression due to her concern of a twenty-pound weight gain. (*Id*.)

On October 16, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 408.) She was tearful and reported an increase in depressive symptoms and self-harm. (*Id*.) She explained her daughter was invited to a sleepover which triggered reminders of sexual trauma she experienced at a sleepover at age 12. (*Id*.)

On October 21, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 406.) She reported seeing a nurse and adjusting her medications. (Id.) She reported fewer depressive symptoms. (*Id*.) Ms. Skruck discussed the possibility of an Intensive Outpatient Program ("IOP") if symptoms worsen. (*Id*.)

On October 28, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 404.) She reported an improvement in mood. (*Id*.) She reported applying for a job and her consideration of applying for another job. (*Id*.) She reported contacting a college about what she needs to enroll. (*Id*.)

On October 31, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 403.) She reported increased depressive symptoms and self-harm after watching a series with many trauma triggers and depicting suicide. (*Id*.)

On November 11, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 400.) She reported changes in her medication. (*Id*.) They worked on coping skills. (*Id*.)

7

On November 13, 2019, Fridley presented for a medication follow-up appointment. (*Id*. at 451.) She reported thinking two of the medications were effective and thought a dose needed to be increased. (*Id*.) Her mood disorder was described as "controlled". (*Id*.) It was noted that she was doing well with her current regimen as it relates to her ADHD. (*Id*. at 453.)

On November 14, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 399.) She reported recent increase in stressors and self-harm. (*Id*.) They discussed ways to manage stressors. (*Id*.)

On December 16, 2019, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 441.) She reported an "increase in pleasant activities, particularly activities with children and artwork she is using to create Christmas gifts." (*Id*.) She discussed personal and financial stressors, difficulty using breathing exercises, and some success using grounding techniques. (*Id*.)

On January 15, 2020, Fridley presented for a medication "recheck". (*Id*. at 454.) She reported feeling that her "anxiety is controlled, but depression is less controlled." (*Id*.)

On January 30, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 425.) She reported a traumatic sexual incident with her children's father. (*Id*.) The incident triggered previous sexual trauma, and she reported dissociating during the incident and having flashbacks. (*Id*.) They worked on techniques to manage trauma symptoms. (*Id*.) She reported a reduction in self-harm. (*Id*.)

On February 3, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 424.) She reported sleep struggles since the incident with her children's father. (*Id*.) They discussed her struggle to take action in certain areas and worked on alternative thinking. (*Id*.)

On February 6, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 423.) She reported scheduling an appointment with her primary care to address medication concerns. (*Id*.) She believes taking Wellbutrin along with two ADHD stimulants is exacerbating her anxiety symptoms. (*Id*.)

On February 10, 2020, Ms. Skruck wrote to one of Fridley's new providers, explaining she attends counseling for depression and anxiety, has trauma history, "current circumstances very difficult", significant insomnia recently and some visual hallucinations, antidepressants reduce depressive symptoms but client thinks they create "problematic side effects", struggles with self-harm behavior, and she works hard in therapy and is making progress. (*Id*. at 473.)

On March 10, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 463.) She reported learning her children's father is gambling and it is impacting the household. (*Id*.) She reported feeling "significant distress" and engaging in self-harm. (*Id*.)

Fridley continued remote therapy during the Covid-19 pandemic. (*Id*. at 477-85, 505-26, 546-53.) She reported ongoing anxiety due to sharing space with her children's father. (*Id*.)

On August 6, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 544.) She reported increased symptoms of depression that she attributed to the impact of Covid-19. (*Id*.)

On August 25, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 538.) She reported trouble wearing a face mask because it is a trigger to past trauma and causes panic attacks. (*Id*.) She expressed concern about being able to function in public and obtain employment due to having to wear a face mask. (*Id*.) She was encouraged to schedule an appointment with her physician to explore a medical exemption and request a referral to a psychiatrist that specializes in trauma. (*Id*.) They discussed her struggle with seeking employment. (*Id*.) They worked on grounding techniques. (*Id*.)

On August 27, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 537.) She reported significant trauma symptoms, was encouraged to see a psychiatrist specializing in trauma, and they worked on grounding techniques. (*Id*.)

On August 31, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 536.) She reported increased feelings of sadness and anger related to past trauma. (*Id*.) They worked on coping. (*Id*.)

9

On September 3, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 535.) She reported trauma symptoms, including re-experiencing physical and psychological reactivity to trauma cues and hypervigilance, which impact depression. (*Id*.)

On September 14, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 532.) She reported medication changes and discussed sexually inappropriate behavior she experienced as a child by an uncle, father, and adolescent male. (*Id*.)

On September 17, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 531.) They worked on decreasing self-harm behavior and coping with trauma symptoms. (*Id*.)

On September 21, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 530.) She reported engaging in positive activities with her children, including art. (*Id*.) She had some success using skills to manage her trauma symptoms. (*Id*.) She reported an increase in self-harm. (*Id*.)

On September 28, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 528.) She reported a decrease in self-harm behavior and ongoing trauma symptoms. (*Id*.) They worked on coping skills. (*Id*.)

On October 30, 2020, Ms. Skruck contacted Opportunities for Ohioans with Disabilities to exploring referring Fridley for vocational services. (*Id*. at 573.)

On November 3, 2020, Ms. Skruck wrote to Fridley's new provider, Laura Kraus, APRN.CPN. (*Id*. at 559.) She explained Fridley's depression and anxiety symptoms and her recent diagnosis of post-traumatic stress disorder. (*Id*. at 560.) She described Fridley participates in counseling twice per week and puts forth effort in her treatment. (*Id*.)

On December 17, 2020, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 594.) Her sessions resumed in person due to the severity of her symptoms. (*Id*.) She reported an increase in PTSD and depressive symptoms due to intrusive trauma memories. (*Id*.) They worked on coping skills. (*Id*.)

On January 11, 2021, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 582.) She reported using coping strategies and stress related to her relationship with her mother. (*Id*.)

On February 4, 2021, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 610.) She reported an increase in trauma symptoms. (*Id*.) They worked on coping skills. (*Id*.)

On February 15, 2021, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 608.) She reported increased value-based action with her children. (*Id*.) She reported frequent trauma reminders and symptoms. (*Id*.) They worked on coping skills. (*Id*.)

On March 4, 2021, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 607.) She reported having a panic attack that morning, explaining her anxiety was heightened after experience a trauma reminder the day before. (*Id*.)

On March 9, 2021, Fridley presented for a psychiatric medication management appointment with nurse Kraus. (*Id*. at 909.) She reported a panic attack the week before. (*Id*. at 910.) She reported increased depression and self-harm since she stopped taking Cymbalta. (*Id*.) Ms. Kraus noted Fridley was "not very forthcoming." (*Id*.) Fridley reported seeing her therapist twice per week, working on an art project, watching documentaries, and wanting to obtain unemployment benefits. (*Id*.)

On April 15, 2021, Ms. Skruck called Fridley's psychiatric nurse practitioner, Laura Kraus. (*Id*. at 646.) Ms. Skruck reported concerns that Fridley's depressive symptoms were increasing including anhedonia and sleep disturbance, and symptoms appeared to increase when her Paxil dose was increased. (*Id*.) Ms. Kraus discussed that one of Fridley's medications can increase depressive symptoms and was going to communicate this to Fridley. (*Id*.)

On May 13, 2021, Ms. Skruck wrote an update to nurse Kraus. (*Id*. at 683.) She explained Fridley continues to experience symptoms of depression and PTSD. (*Id*.) She no longer takes a beta blocker. (*Id*.) The Paxil she takes reduces anxiety symptoms but does not reduce PTSD or depression symptoms. (*Id*.) She

11

puts forth effort to apply coping skills learned in therapy. (*Id*. at 684.) She has been able to attend her children's recent school events, exercise, spend time with siblings, and engage in art projects. (*Id*.) Her living situation remains difficult and she is significantly impacted by criticism from her family of origin. (*Id*.)

On May 21, 2021, Fridley presented for a psychiatric medication management appointment with nurse Kraus. (*Id*. at 858.) Mental status exam revealed she was appropriately dressed, had poor eye contact, intact memory, normal concentration, depressed and anxious mood, blunted affect, clear speech, intact associations, logical, coherent, and rational thought process, no evidence of disturbance in thought perception or progression, and appropriate and adequate fund of knowledge. (*Id*. at 861.)

On June 14, 2021, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 668.) She reported her psychiatric provider is adjusting her medications. (*Id*.)

On June 28, 2021, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 662.) Foley reported believing she has made "significant progress" in counseling and identified stressors and difficulty with medication ineffectiveness as impacting her symptoms. (*Id*.)

On July 14, 2021, Fridley presented for a virtual emergency appointment with nurse Kraus due to having two panic attacks in the past two weeks. (*Id*. at 891-92.) Her medications were adjusted. (*Id*.)

On July 31, 2021, Fridley presented for a psychiatric medication management appointment with nurse Kraus. (*Id*. at 887.) Mental status exam revealed she was appropriately dressed, had poor eye contact, intact memory, normal concentration, depressed and anxious mood, blunted affect, clear speech, normal language, intact associations, logical, coherent, and rational thought process, and appropriate and adequate fund of knowledge. (*Id*. at 890.)

On October 27, 2021, Fridley presented for a psychiatric medication management appointment with nurse Kraus. (*Id*. at 878.) Mental status exam revealed she was appropriately dressed, had poor eye contact,

intact memory, normal concentration, depressed and anxious mood, blunted affect, clear speech, normal language, intact associations, logical, coherent, and rational thought process, and appropriate and adequate fund of knowledge. (*Id*. at 881.)

Through 2021, Fridley continued counseling with Ms. Skruck. (*Id*. at 687-711, 713-38, 740-42, 744-66, 769-74.)

On January 3, 2022, Fridley presented for a counseling session with Ms. Skruck. (*Id*. at 803.) She indicated her symptoms were "high" and identified being impacted by her children's father's recent actions towards her and "being confined." (*Id*.)

On February 21, 2022, Fridley presented for a psychiatric medication management appointment with nurse Kraus. (*Id*. at 868.) She reported "situational stressors" in her home and increased depression and OCD tendencies. (*Id*.) She stated she "can't not do something" and reported stripping furniture and redoing it several times. (*Id*.) Mental status exam revealed she was appropriately dressed, had poor eye contact, intact memory, normal concentration, depressed and anxious mood, blunted affect, clear speech, normal language, intact associations, logical, coherent, and rational thought process, no evidence of disturbance in thought perception or progress, and appropriate and adequate fund of knowledge. (*Id*. at 870-71.)

Through 2022, Fridley continued counseling with Ms. Skruck. (*Id*. at 776-803, 806-28, 830-50, 1067, 1076.)

On October 21, 2022, Fridley presented for a medication follow-up for ADHD. (*Id*. at 1230.) She was noted as "stable" on her current regimen. (*Id*. at 1232.)

In December 2022, Fridley presented to Hope419 to begin Ketamine treatment. (*Id*. at 1674-1703.)

On January 23, 2023, Ms. Skruck wrote a letter in response to Opportunities for Ohioans with Disabilities' letter requesting information about Fridley. (*Id*. at 1189-91.) She indicating Fridley is being treated for PTSD and major depressive disorder. (*Id*. at 1189.) She explained Fridley also had diagnoses of

13

ADHD and anxiety, but they are not the focus of her treatment because they are not as debilitating. (*Id*.) She indicated Fridley resigned from her job in 2019 due to her concerns that she could not function at work. (*Id*. at 1190.) Her PTSD symptoms are severe, and her depressive symptoms are exacerbated by her PTSD symptoms. (*Id*.) Ms. Skruck opined Fridley's ability to complete work requirements would be impacted by the level of her PTSD symptoms. (*Id*. at 1190-91.) She believed the "greatest concern" was Fridley's ability to maintain concentration, persistence, or pace. (*Id*.)

On January 25, 2023, psychiatric nurse Kraus wrote a letter to support Fridley's claim for social security disability benefits. (*Id*. at 1186-87.) Kraus wrote Fridley suffers from depression, anxiety, PTSD, insomnia, eating disorder, ADHD, OCD, body dysmorphia, and borderline personality disorder. (*Id*. at 1186.) Kraus stated Fridley struggles daily with her symptoms, which impair her activities of daily living and limits her ability to work on a sustained basis. (*Id*. at 1187.)

On February 2, 2023, Fridley presented for a psychiatric medication management appointment with nurse Kraus. (*Id*. at 1213.) Mental status exam revealed she was appropriately dressed, had poor eye contact, intact memory, scattered concentration, depressed and anxious mood, blunted affect, clear and distinct speech, intact associations, logical, coherent, and rational thought process, no evidence of disturbance in thought perception or progression, and appropriate fund of knowledge. (*Id*. at 1217.)

In 2023, Fridley continued to treat with psychiatric nurse Kraus, who noted she was appropriately dressed, had poor eye contact, intact memory, scattered concentration, depressed and anxious mood, blunted affect, clear speech, normal language, intact associations, logical, coherent, and rational thought process, no evidence of disturbance in thought perception or progression, and appropriate and adequate fund of knowledge. (*Id*. at 1217, 1298-99, 1292.) At times she noted sad mood and flat affect. (*Id*. at 1471, 1443.)

In 2023 and 2024, Fridley continued counseling with Ms. Skruck. (*Id*. at 1192-1203, 1315-1402, 1596-1659.) She continued to report PTSD and depressive symptoms. (*Id*.)

14

On December 18, 2023, Fridley presented for a psychiatric medication management appointment with nurse Kraus. (*Id*. at 1426.) Kraus noted Fridley's weekly Ketamine treatments, which had decreased her nightmares, triggers, flashbacks, and obsessive thoughts. (*Id*.) Her depression symptoms continue, and sleep was "hit or miss". (*Id*.) Kraus noted she is "able to multitask when presented with anxiety situations", continued to have dissociative moments, and her therapist "noticed a huge improvement in her processing." (*Id*.) Mental status exam revealed she was appropriate dressed, had intact memory, scattered concentration, happy and tearful mood, flat affect, clear speech, normal language, intact associations, logical, coherent, and rational thought process, no evidence of disturbance in thought perception or progression, and appropriate and adequate fund of knowledge. (*Id*. at 1432.)

On January 10, 2024, Fridley presented for a follow-up visit. (*Id*. at 1515.) She reported her ADHD treatment working well, and sleep improvement. (*Id*.) On examination, she was well-appearing, cooperative, easily engaged in conversation, euthymic, normal mood, clear speech, and good comprehension. (*Id*. at 1517.)

On February 19, 2024, Ms. Skruck completed "Assessment of Ability to do Work-Related Activities (Mental)." (*Id*. at 1661.) In this check-box form, Skruck opined that Fridley "no useful ability to function" in any of the listed areas, which included the ability to: relate to other people, maintain concentration and attention for extended periods, sustain a routine without special supervision, perform activities within a schedule, maintain regular attendance and be punctual, understand, carry out, and remember instructions, respond appropriately to supervision, co-workers, customary work pressures, or changes in the work setting, perform simple tasks, perform complex, repetitive, or varied tasks, or behave in an emotionally stable manner. (*Id*.) On the same date, Ms. Skruck completed an "Off-Task/Absenteeism Questionnaire." (*Id*. at 1662.) Ms. Skruck opined Fridley would be off-task 20 percent of the time and would be absent from work

15

around four days per month. (*Id.*) Ms. Skruck identified Fridley's diagnoses, some symptoms, and side-effects of treatment as the reasons for the off-task limitations. (*Id.*)

## C.      State Agency Reports

### 1.            Mental Impairments

On August 23, 2022, Robyn Murry-Hoffman, Psy.D., reviewed the claim file and opined Fridley had a mild limitation in understanding, remembering or applying information, and moderate limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting and managing herself. (*Id.* at 83.) Dr. Murry-Hoffman thought Fridley could "complete 2-4 step tasks that do not require prolonged periods of focus and concentration and no strict production rates." (*Id.* at 85.) Dr. Murry-Hoffman found Fridley had "the ability to relate to others on a superficial level but would do best in a non-public setting, with a few, [sic] familiar coworkers." (*Id.*)

On June 9, 2023, on reconsideration, Irma Johnson, Psy.D., found there was insufficient evidence prior to the date last insured. (*Id.* at 102.)

## D.      Hearing Testimony

During the February 21, 2024 hearing, Fridley testified to the following:

• She is a high school graduate. (*Id.* at 45.) She has a driver's license and lives with her two children, her "ex/children's father", and his mother. (*Id.*) Her children are ages 13 and 10. (*Id.* at 46.) She previously worked as a server at Applebees. (*Id.*) Her children's father and his mother help parent the children. (*Id.* at 54-55.) She is able to cook, clean, do laundry, and drive. (*Id.* at 55.) She has a friend that stops by and helps keep her "on target." (*Id.*)

• She takes several prescription medications to treat panic attacks, nightmares, migraines, ADHD, and received Ketamine treatment as needed. (*Id.* at 47-48.) Side-effects of the medications include feeling foggy, sleepiness, grogginess, nervousness, headaches, and feeling "out of it". (*Id.* at 49.) She received Ketamine treatment in office one to two times per week. (*Id.*) It is a nasal spray, and she is monitored for side effects in the office. (*Id.* at 61.) She finds it hard to fall asleep and then when she does fall asleep, she has nightmares. (*Id.* at 50.) She has nightmares four or five nights per week. (*Id.*) She naps every day. (*Id.*)

• Unknown situations and being in close quarters with males cause her anxiety. (*Id.* at 50-51.) Being on the phone makes her anxious. (*Id.* at 51.) She experiences panic attacks two

16

to three times per week. (*Id*.) When she has a panic attack, she tries to seclude herself and take medication. (*Id*.) The effects of a panic attack lasts a couple hours. (*Id*.) She uses breathing skills to cope. (*Id*. at 52.) She has flashbacks during the day that usually triggers panic attacks. (*Id*.)

• She has some OCD symptoms. (*Id*. at 53.) She has "excessive perfectionism" and cannot "move past step A until . . . things are just so." (*Id*.) For example, she redoes furniture as a hobby, and stripped and refinished a dresser five different times because she couldn't get passed a certain flaw. (*Id*.) Other hobbies include crafting projects like making jewelry, and birdwatching. (*Id*. at 56.)

• She uses self-injury as a coping mechanism. (*Id*. at 54.) It makes her "dissociative symptoms go down." (*Id*.) She engages in self-injurious behavior daily. (*Id*. at 61.)

• She has ADHD. (*Id*.) When depressive symptoms increase, her concentration and focus are "all over the place." (*Id*.)

• She quit her last job because she thought she was going to get fired. (*Id*. at 56.) She was checking people in at the county health department. (*Id*.) It was fast paced and interacting with a lot of people. (*Id*.) She had a hard time keeping up with her responsibilities. (*Id*. at 56-57.) She worked there for almost a year. (*Id*. at 57.) She started working for DoorDash a little bit. (*Id*. 57-58.) She experienced anxiety while working for DoorDash. (*Id*. at 58.)

• She attends counseling sessions three times per week. (*Id*. at 59.) She increased from once per week, to twice per week, and then three times per week during the Covid shutdown. (*Id*.) Her depression is "treatment resistant". (*Id*.)

The VE testified Fridley had past work as a waitress.  (*Id*. at 64.) The ALJ then posed the following hypothetical question:

> For these hypotheticals, please consider a younger individual born in 1987, with a high school education. For the first question, the individual has no exertional limitations, but would have the following non-exertional limitations. This hypothetical individual would be limited to simple, routine tasks that involve no more than simple, work-related decision making. Occasional interaction with others that does not involve arbitration, negotiation or confrontation. The hypothetical individual cannot direct the work of others or be responsible for the safety or welfare of others. Cannot perform assembly line work or work that involves strict production quotas. And the hypothetical individual would be limited to occasional workplace changes that are gradual and explained in advance. Ms. Lee, that would be hypothetical question number one. . . .

> In your professional opinion with those limitations, would the waitress job be available as it is normally done in the national economy or as performed by this claimant?

(*Id*. at 64-65.) The VE testified the hypothetical individual would not be able to perform Fridley's past work as waitress.  (*Id*. at 65.)  The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as hand packager, commercial cleaner, and kitchen helper. (*Id*.)  The ALJ asked a second hypothetical:

> If we were to take that first hypothetical, call this one number two. Add an additional limitation that based on the type of psychological symptoms we've discussed today, the individual would be off task in the work setting 33 percent of the day on an ongoing basis. Would there be any work for such an individual?

(*Id*. at 65.) The VE responded, "No, there would not be." (*Id*.) The VE testified that being off task 20 percent or greater would preclude employment. (*Id*. at 66.) The ALJ asked, "Let me ask you a third hypothetical regarding absenteeism. If we take the first question, but add a limitation the individual will be absent from work once a week on an ongoing basis, any jobs for such an individual?" The VE responded, "No." (*Id*.) The VE explained that one absence per month is the threshold for maintaining employment. (*Id*.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

18

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Fridley was insured on the alleged disability onset date, August 1, 2019, and remains insured through December 31, 2019, the date last insured ("DLI"). (Tr. 17, 18, 69, 71.) Therefore, in order to be entitled to DIB (Medicare only), Fridley must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

19

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant's date last insured for Medicare purposes is December 31, 2019.

2. The claimant has not engaged in substantial gainful activity since August 1, 2019, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: under the Title II claim, depressive disorder, anxiety disorder, and attention deficit-hyperactivity disorder are established as severe. Under the Title XVI claim, post-traumatic stress disorder, obsessive compulsive disorder, and borderline personality disorder are established as severe (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to the performance of simple, routine tasks and to the making of no more than simple, work-related decisions, conducted in a work setting free of assembly line work or work imposing strict production quotas, which setting requires no more than occasional interaction with others and imposes no tasks involving arbitration, negotiation, confrontation, directing the work of, or conferring responsibility upon the claimant for the safety or welfare of, others, which setting contemplates occasional workplace changes, explained in advance of gradual implementation.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on December 10, 1987 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964). Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not

20

disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-30.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence

21

could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.      Opinion Evidence.**

In her sole assignment of error, Fridley argues the ALJ's RFC is not supported by substantial evidence because the ALJ failed to consider the supportability and consistency factors when evaluating Ms.

Skruck's medical opinion. (Doc. No. 6 at 19, 22-23.) Fridley contends the ALJ's finding that there is no objective basis for Ms. Skruck's opinion on absenteeism does not consider the supportability factor. (*Id*. at 23.) Fridley states the failure to consider the supportability factor was harmful because the medical treatment records support Ms. Skruck's opinions. (*Id*.) Fridley argues the ALJ's discussion of Fridley's ability to participate in therapy as evidence of inconsistency mischaracterizes the evidence. (*Id*. at 24.)

In response, the Commissioner argues the ALJ made statements addressing the supportability factor, such as Ms. Skruck admitting she was not qualified to make a determination regarding Fridley's suitability for employment. (Doc. No. 8 at 9.) The Commissioner states the ALJ's opinion should be looked at as a whole, and the ALJ, in other paragraphs of the decision, discussed findings from Ms. Skruck's counseling records that were at odds with her highly limiting opinion. (*Id*.) The Commissioner states the ALJ's conclusion that Ms. Skruck's opinions were not consistent with the overall evidence of record was proper. (*Id*. at 11.)  The Commissioner argues the ALJ cited Fridley's various activities that were inconsistent with Ms. Skruck's conclusions. (*Id*.)

In her reply brief, Fridley argues that even looking at the ALJ's opinion as a whole does not "save the ALJ's failure to properly consider the supportability of Ms. Skruck's opinions." (Doc. No. 9 at 2.) Fridley contends the ALJ failed to cite certain medical evidence that would support Ms. Skruck's opinions. (*Id*.)

Since Fridley's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings,

including those from your medical sources."  20 C.F.R. § 404.1520c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.
>
> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

24

important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed Ms. Skruck's opinion as follows:

Jennifer Skruck, LPCC, offered two opinions of function. One, dated January 23, 2023, indicated that it would be profoundly difficult for the claimant to obtain and maintain employment, owing to difficulties of memory, concentration, and social interaction. One, dated February 19, 2024, described extreme limitations in the claimant's ability to understand, remember, and carry out instructions, in her ability to socialize with others, in her ability to concentrate, persist, and maintain pace, and in her ability to adapt to the stressors of day-to-day work. This latter opinion also indicated that the claimant would be absent four and five or more [*sic*.] days per month, would be off-task twenty percent or more of the time, and that her condition would deteriorate even under the stressors of day-to-day work. Ms. Skruck has been treating the claimant since before the alleged onset

25

date and is reporting within the bounds of her professional certifications. However, she concedes the claimant's suitability for employment is a determination she is not qualified to make (29F). Examination of the records discloses that the claimant has presented as and when appointed [the evidence shows Ms. Skruck has missed more sessions than the claimant] and has been able to participate fully and meaningfully in her own treatment and planning. There is really no objective basis for her opinions on absenteeism and off-task behaviors. Otherwise, her opinion overstates, to significant degree, and by comparison to the overall evidence of record, described in digest form above in the analysis of the opinions of Drs. Johnston and Murry-Hoffman, the claimant's cognitive, social, and adaptive deficits. These opinions are not consistent with, or supported by, the overall evidence of record and are not persuasive.

(Tr. 27.) In his analysis of the opinions of Drs. Johnstone and Murry-Hoffman, the ALJ wrote, in part:

The record shows a claimant with chronic psychological disorders. These would be expected to, the claimant reports (3E/3, 6), and the record supports (30F/10), (34F/8), do, impose at least episodic deficits of focus and concentration. However, the claimant has a post-high school level of education, acquired without receipt of special education (2E/3). She has retained an adequate, appropriate fund of knowledge over time (3F/13), (34F/8). Her memory is reliably reported as intact (3F/13), (21F/11), (30F/30), (34F/8), and her attention and concentration is often described as preserved (3F/13), (21F/11), (30F/30), (39F/23). Her thought process is reliably described as circumstantial (3F/13), logical, coherent and rational (21F/11), (30F/30), (34F/3). Experience has shown a wide divergence regarding the significance, and even the meaning, of tasks divided by the number of steps; between, but also within, the medical and vocational communities. I attach no significance to; rather, I have ignored, the limitation to two- to-four-step tasks. Since early in 2023, the claimant's attention and concentration has often been described as scattered. Nevertheless, if restricted to the performance of simple, routine, tasks, conducted free of the need to mull complex decisions, or to adhere to anxiety- or frustration-inducing production pressures, the evidence shows the claimant has retained sufficient, residual, cognitive function to engage in competitive work. The claimant has described difficulties getting along with others (3E/5-6). She is often described in the evidence in "off-putting" terms (3F/13), (30F/10). However, she denies significant difficulties with those in authority or having ever lost a job due to interpersonal difficulties (3E/6). She describes visiting with friends, securing rides from friends, having a friend who helps organize her medications (3E/3), (20F/2), (31F/5). She is demonstrably able to function in public places, including stores (3E/4), restaurants (3E/5), school events (29F/5), and on outings involving her children, children of others, and friends (32F/10). She is described by various providers in "pro-social" terms: cooperative and easily

26

engaged in conversation (35F/4), calm, cooperative, and engaged, with fair eye contact (39F/8, 23). She has begun to work part-time for "Door-dash" (34F/2). Provided the frequency, and potential for escalation in the emotional intensity, of her interaction with others is controlled, the evidence shows she has retained sufficient, residual, social function to engage in competitive work. The claimant has described a poor reaction to stressors and changes (3E/7). Isolated treatment notes have described deficits of insight (3F/13). However, Treatment notes generally report fair insight and/or judgement (3F/13), (39F/23). Counseling notes describe the claimant as having, learning, and employing coping skills (3F/3, 7), (5F/21), (19F/4), (20F/22), (28F/2), to the extent that she describes herself as capable of multi-tasking in anxiety-filled situations (34F/2), and having less emotional lability in difficult situations (36F/56). The claimant's mental status examinations did not materially deteriorate (3F/13) *compare with* (34F/8), despite changes and stressors including her daughter's dental surgery (19F/4), being forced into cohabitation with an ex-boyfriend for financial reasons (3F/13), or the movement of her household (16B). The claimant is the primary caregiver to two minor children (3E). . .

(*Id*. at 25-26.) Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions. 20 C.F.R. § 404.1520c(a). Reading the decision as a whole and with common sense, the ALJ considered the supportability and consistency of Ms. Skruck's opinion. *See Hartzer v. Comm'r of Soc. Sec.*, No. 3:23-CV-01972-JRK, 2024 WL 3963540, at *8 (N.D. Ohio Aug. 28, 2024), *report and recommendation adopted,* No. 3:23 CV 1972, 2024 WL 5054890 (N.D. Ohio Dec. 10, 2024), citing *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (affirming ALJ's evaluation of opinion where "[e]lsewhere in her decision, the ALJ laid out in detail the treatment records" undercutting the opinion); *Buckhannon v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (recognizing courts "read the ALJ's decision as a whole and with common sense"). For example, the ALJ considered the supportability of Ms. Skruck's opinion, including a discussion of the records indicating Fridley presented to her appointments and has been able to participate fully and meaningfully in her own treatment and planning, and her statement that she is not qualified to determine Fridley's suitability for employment.  (Tr. 27.) The ALJ references Ms. Skruck's counseling notes that describe Fridley as having, learning, and using coping skills. (*Id*. at 25.)

27

The ALJ considered the consistency of Ms. Skruck's opinion, referencing his extensive discussion of the record evidence, including her history of getting along with others, her activities, engagement in part-time work for DoorDash, treatment notes, counseling notes, and the results of mental status exams. (*Id*. at 25-26.) The ALJ concluded that Ms. Skruck's "opinions are not consistent with, or supported by, the overall evidence of record and are not persuasive." (*Id*. at 27.) Here, the ALJ considered both the supportability and consistency of Ms. Skruck's opinion.

It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here. While Fridley would weigh the evidence differently, it is not for the Court to do so on appeal.

There is no error.

### VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: April 6, 2026

    *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**